UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------×
KEVIN O'HORA,

       *Plaintiff,*                                   **17 CV 5748**

    *v.*

S&P GLOBAL, INC.,                                  **COMPLAINT**

       *Defendant.*
------------------------------------------------------------------------×

      Plaintiff Kevin O'Hora, by his counsel, The Harman Firm, LLP, alleges for his Complaint against Defendant S&P Global, Inc., as follows:

### PRELIMINARY STATEMENT

    1.    Plaintiff Kevin O'Hora seeks damages and costs against Defendant S&P Global, Inc. ("S&P"), for retaliating against him for whistleblowing by, among other things, terminating his employment, in violation of the Sarbanes-Oxley Act of 2002 ("SOX"), as amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act, 18 U.S.C. § 1514A(a)(1)(C).

    2.    Plaintiff also seeks damages and costs against Defendant for breach of contract, in violation of the New York State common law.

    3.    Mr. O'Hora worked for S&P, then known as McGraw Hill Financial, Inc., in its Ratings Services division for approximately 25 years.

    4.    S&P is a Nationally Recognized Statistical Ratings Organization ("NRSRO"), monitoring and rating the risk involved in various securities.

    5.    Mr. O'Hora repeatedly raised serious financial accounting issues with S&P's senior management, including violations of Staff Accounting Bulletins ("SABs") promulgated by the Securities and Exchange Commission ("SEC").

6. Shortly after Mr. O'Hora made these complaints, S&P began to exclude him at work, falsely criticized his job performance, and, ultimately, terminated his employment.

## JURISDICTION, VENUE, AND ADMINISTRATIVE PREREQUISITES

7. Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over Plaintiff's claims arising under SOX.

8. Pursuant to 28 U.S.C. § 1332, this Court has supplemental jurisdiction over Plaintiff's common law claims, as those claims are so related to the federal claims that they form part of the same case or controversy.

9. Pursuant to 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Southern District of New York, as a substantial part of the events giving rise to these claims occurred within this District.

10. All conditions precedent to maintaining this action have been fulfilled: On or about March 16, 2016, Plaintiff filed a complaint with the Occupational Safety and Health Administration of the Department of Labor.

## TRIAL BY JURY

11. Plaintiff respectfully requests a trial before a jury.

## PARTIES

12. Plaintiff, at all times relevant hereto, was and is a resident of Bergen County in the State of New Jersey.

13. Upon information and belief, at all times relevant hereto, Defendant was and is a corporation organized under the laws of the State of New York with its principal place of business located at 55 Water Street, New York, New York 10041 in New York County.

## COVERAGE UNDER SOX

14. At all times relevant here to, Plaintiff was Defendant's "employee" within the meaning of SOX, as described below.

15. At all times relevant hereto, Defendant was Plaintiff's "employer" within the meaning of SOX, as described below.

16. Defendant was, and continues to be, an "employer" within the meaning of SOX.

17. At all times relevant hereto, Defendant was, and continues to be, an NRSRO, and governed by the whistleblower provisions of SOX.

## STATEMENT OF FACTS

18. Mr. O'Hora began working for S&P on or about September 11, 1989, as a Financial Correspondent.

19. During his tenure at S&P, Mr. O'Hora earned several promotions, ultimately reaching the position of Senior Manager of Client Order Services.

20. Mr. O'Hora spent the majority of his time at S&P working in the Accounting–Client Order Services department of the Ratings division.

21. Mr. O'Hora was not, however, a Certified Public Accountant (CPA).

22. Mr. O'Hora's job performance with S&P was consistently excellent.

23. In and around 2012, Mr. O'Hora was one of few members of the Order Services department to avoid being laid off as part of a reduction in force in which S&P terminated most of its senior accountants, including nearly all of the employees who were CPAs.

24. In and around 2015, Mr. O'Hora became aware of accounting practices at S&P that violated SABs issued by the SEC, including, but not limited to, SAB 104, which describes appropriate revenue recognition techniques.

25. As part of its ratings services, S&P charges annual "surveillance" fees to the issuers of securities.

26. In exchange for this subscription fee, S&P is supposed to perform a risk analysis of the security in question and issue a rating of that security.

27. S&P issues an annual invoice to the security's issuer, which the issuer then pays.

28. Mr. O'Hora began to notice S&P's practice of issuing invoices for securities which had failed to pay previous years' invoices.

29. A security's invoice might go unpaid if the security is completely redeemed, has reached the end of its intended lifespan, or has failed in some way—by becoming defunct or otherwise ceasing to exist.

30. Many securities failed during and in the wake of the financial crisis, which was precipitated, at least in part, by the failure of NRSROs to accurately gauge risk.

31. Mr. O'Hora was concerned that S&P not only continued to issue invoices for securities that had previously failed to pay, but that S&P would categorize the amount payable on these invoices as "revenue."

32. S&P would then proceed to report this revenue on its books, even though it would not be paid to the company.

33. In some cases, S&P would wait over a year to write off this bad revenue.

34. During Mr. O'Hora's tenure with S&P, the company maintained an internal committee charged with maintaining compliance with the SABs issued by the SEC (the "SAB Committee").

35. The SAB Committee consisted of senior accountants, the majority of whom were CPAs.

36. The SAB Committee was tasked with ensuring that the revenue generated by the various complex products and services provided by S&P was properly recognized in accordance with the SEC's SABs, including SAB 104.

37. SAB 104 describes proper accounting methods for reporting revenue.

38. Among other things, SAB 104 states that revenue that is unlikely to be collected should not be reported.

39. The SAB Committee created several new procedures and strengthened internal processes and controls regarding revenue recognition and bad debt write-offs.

40. The SAB Committee also established strict rules for revenue recognition that required "proof of delivery" of a product or service before revenue could be recognized.

41. While at S&P, Mr. O'Hora understood the material contained in SABs issued by the SEC to be mandatory accounting regulations.

42. The SAB Commission was shuttered in and around 2012, when S&P eliminated the Senior Director, Vice President, and Financial Analyst positions in the Client Order Services department—positions held by CPAs with formal training in revenue recognition and SEC regulations.

43. After these terminations, Mr. O'Hora grew seriously concerned about S&P's lapsed revenue reporting practices, particularly as they violated SAB 104.

44. Mr. O'Hora repeatedly raised this problem with his managers at S&P, but S&P refused to change its practices.

45. Mr. O'Hora worked to assemble a list of the securities that were most overdue and which had failed to pay S&P in years past in an effort to identify the most egregious examples of improper revenue reporting.

46.     S&P regularly refused to write off the unrecoverable revenue that Mr. O'Hora identified, even after he identified it as a violation of SAB 104.

47.     Mr. O'Hora repeatedly submitted requests to write off old and/or bad revenue, but his requests were nearly always rejected, even though S&P's supposed standard operating procedure was to review revenue on a monthly basis.

48.     S&P's actions resulted in inaccurate financial statements and reports.

49.     Mr. O'Hora believed that S&P intentionally reported bad revenue, manipulated reserves, delayed write-offs, and continued to bill defunct securities in an effort to "smooth" its earnings over time, manipulating revenue to create the illusion of consistent revenue growth to support its stock price.

50.     After Mr. O'Hora's complaints of regulatory violations, S&P began to retaliate against him.

51.     S&P manufactured false write-ups and criticism of Mr. O'Hora.

52.     S&P began circumventing Mr. O'Hora in the accounting department's chain of command.

53.     S&P issued Mr. O'Hora a negative performance review and gave him an unachievable "performance improvement plan."

54.     In and around October 2015, S&P terminated Mr. O'Hora's employment, claiming that his performance was lacking and stating that he had not met the goals set forth in his performance improvement plan.

55.     Mr. O'Hora had been an outstanding employee at S&P for over 26 years: He had received numerous promotions, was spared from a reduction-in-force that laid off nearly the entire Order Services department, and had volunteered to take on additional, onerous job

6

responsibilities, such as travelling to India for extended periods of time to oversee S&P's outsourcing.

56. Only after Mr. O'Hora brought S&P's improper accounting practices to light did S&P begin to criticize his performance.

57. S&P retaliated against and terminated Mr. O'Hora because he repeatedly complained of what he perceived to be dangerous and illegal accounting practices.

58. Mr. O'Hora's contract with S&P provided for a severance package based on the length of his tenure with the company.

59. When Mr. O'Hora was initially selected as part of the 2012 reduction in force, S&P offered him a severance package exceeding one year's salary, which, at the time, was approximately $132,000 per year.

60. At the time of his termination in 2015, S&P refused even to offer Mr. O'Hora the severance package to which he was contractually entitled, claiming that the alleged performance deficiencies amounted to termination "for cause."

## CAUSES OF ACTION
### FIRST CAUSE OF ACTION
**Whistleblower Retaliation in Violation of SOX**

61. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 60 with the same force as though separately alleged herein.

62. At all relevant times, Plaintiff was an "employee" and Defendant was an "employer," as contemplated under SOX.

63. SOX prohibits NRSROs from retaliating against an employee for providing information concerning conduct which the employee reasonably believes constitutes a violation

of any rule or regulation of the SEC to an individual with supervisory authority over that employee.

64. Mr. O'Hora complained about and provided information concerning S&P's violation of SAB 104, which he reasonably believed to be a rule or regulation of the SEC, to his supervisors at S&P.

65. As a result of Defendant's unlawful acts, Plaintiff has been deprived of wages in an amount to be determined at trial and is entitled to recovery of such amounts, non-economic special damages, prejudgment interest, attorneys' fees, costs, and other compensation which the Court deems appropriate.

## SECOND CAUSE OF ACTION
### Breach of Contract in Violation of the New York State Common Law

66. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 65 with the same force as though separately alleged herein.

67. Plaintiff's employment relationship with Defendant was governed by handbooks and agreements which, among other things, provided for severance in the event that Plaintiff was terminated by Defendant.

68. Defendant refused to offer Plaintiff severance upon his termination and failed to satisfy its contractual obligations to Plaintiff.

69. Plaintiff is entitled to compensatory damages, costs, fees, and any other damages and compensation the Court deems appropriate.

**REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests the following relief:

A. For the first cause of action, damages to be determined at trial;

B. For the second cause of action, damages to be determined at trial; and

C. For such other and further relief as the Court deems just and proper.

Dated:   New York, New York
July 28, 2017

By: _____
Walker G. Harman, Jr. [WH-8044]
Owen H. Laird [OL-6994]
THE HARMAN FIRM, LLP
220 Fifth Avenue, Suite 900
New York, NY 10001
(212) 425-2600
wharman@theharmanfirm.com
olaird@theharmanfirm.com

*Attorneys for Plaintiff*

9